**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **DEPARTMENT OF TOXIC SUBSTANCES CONTROL,**<br><br>  Plaintiff,<br><br>   v.<br><br>**WITCO CORPORATION, et al.,**<br><br>  Defendants. | 1:98-cv-6264  OWW TAG<br><br>MEMORANDUM DECISION AND ORDER APPROVING AND ENTERING CONSENT DECREE BETWEEN DTSC AND WESTERN FARM SERVICES |

## I.   INTRODUCTION

Before the Court for decision is a request for approval of a consent decree ("Consent Decree" or "Decree") that would settle all claims brought by Plaintiff, the California Department of Toxic Substances Control ("Plaintiff" or "DTSC") against Western Farm Services ("Western").

## II.   BACKGROUND

This case concerns two San Joaquin Drum Company ("SJDC") industrial drum processing sites located at 3930 Gilmore Avenue ("Gilmore Property") and 3213 Gibson Street ("Cady Property") in Bakersfield, California.  While in business, SJDC cleaned drums used for various purposes, stripped them of paint, and then repainted them.  SJDC processed drums at the Gilmore Property and

1

used the Cady Property for drum storage.  During a period of time from the 1960s through the late 1970s or early 1980s, hazardous materials were released from the Gilmore and Cady properties.  In the early 1980s, operations at the Gilmore and Cady sites ceased.

After SJDC shut down its operations, the Cady Property was sold.  The subsequent attempted sale of the Gilmore Property attracted the attention of the DTSC.  Upon inspection, DTSC discovered 800-1,000 drums and two underground sumps filled with liquid at the Gilmore Property.  DTSC found the soil and groundwater contaminated with hazardous substances within the meaning of 42 U.S.C. § 9601(14).

Defendants in this case are Clifford Pitts (owner of SJDC), Witco Corporation ("Crompton")[1], Dow Chemical Company ("Dow"), Western Farm Services ("Western"), Chevron Corporation ("Chevron"), and Helt Petroleum Corporation ("Helt"), several of which have made cross-claims against each other.  The suit alleges violations of the Comprehensive Environmental Responsibility, Compensation & Liability Act ("CERCLA"), 42 U.S.C. § 9601, et seq., the Resource Conservation & Recovery Act ("RCRA"), 42 U.S.C. § 6901, et seq., and state nuisance law. Both CERCLA and RCRA apply to generators and transporters of hazardous substances, as well as owners and operators of disposal or treatment facilities (collectively referred to as "Potentially Responsible Parties" or "PRPs").  42 U.S.C. §§ 6973, 9607.  PRPs are strictly liable, and jointly and severally liable, for response costs and remedial action incurred by the government

---

[1] Witco Corporation was acquired by Crompton Corporation.

2

unless they can prove that the release of hazardous substances was caused solely by unrelated persons or events. *Id.; see also United States v. Monsanto*, 858 F.2d 160, 171, 73 (4th Cir. 1988). DTSC alleges that the corporate Defendants (or their predecessors) sent used drums, contaminated with hazardous materials, to SJDC for processing.[2]

DTSC filed an initial complaint on October 30, 1998 based on the Gilmore Property. A first amended complaint, adding Chevron as a Defendant, was filed on August 5, 1999. Helt was dismissed without prejudice on September 3, 1999. Through negotiations, DTSC formulated a global settlement offer on June 12, 2003. DTSC withdrew the offer before any Defendants had accepted after determining that the Cady Property had also been used by SJDC and might also be contaminated. A second amended complaint was filed on June 25, 2003 to include the Cady Property.

From 1981 through the present, investigation and cleanup activities have taken place on the Gilmore Property. DTSC has incurred $1 million in response costs for the Gilmore Property to date (including interest but excluding attorney's fees). Shortly after the initial filing of this suit in 1998, the case was stayed to allow for work and further investigation at the Gilmore Property. These actions included a focused site investigation undertaken by Defendants in December 1999, a follow-up soil and

---

[2] Western is implicated in this suit through Coberly & Plumb, a pesticide formulator that is now part of Western, who is alleged to have sent contaminated drums to SJDC. Doc. 165 at 3. Crompton is implicated through a subsidiary of Witco Corporation, which is now part of Crompton, that allegedly delivered used drums for cleaning or reconditioning to SJDC. *Id.* at 3.

3

groundwater investigation undertaken by Defendants in May 2001, emergency removal action undertaken by DTSC in November 2001, and a geophysical survey and soil sampling undertaken by the United States Environmental Protection Agency ("US EPA") in the summer of 2003.  DTSC states that "no investigative or cleanup activities related to the operation of San Joaqiun Drum Company have taken place at the...Cady Property."  Doc. 159 at 3.

### A.   The Chevron Settlement

On January 29, 2004 a final settlement agreement was signed between DTSC and Chevron.  The settlement agreement was approved by the court on March 15, 2004.  Doc. 146.  Chevron agreed to (1) perform emergency response actions identified by the US EPA as necessary to address imminent dangers at the Gilmore Property; (2) remove all underground structures and attendant soil that cause contamination; (3) monitor the quality of the groundwater; and (4) pay any DTSC and US EPA response costs incurred after October 31, 2003 that are spent in overseeing Chevron's actions. All work performed by Chevron (both planning and actual implementation) must be reviewed by DTSC or the US EPA.  DTSC estimates that Chevron has made total expenditures of approximately $542,000 - $642,000 (including $400,000 - 500,000 for work performed at the Gilmore site and $142,000 in oversight costs).  Doc. 188, filed Aug. 9, 2005, at 2.

In addition to the work Chevron has agreed to perform at the Gilmore site and the $1 million in costs already incurred by DTSC to date, DTSC estimates that it will incur additional costs to remedy remaining soil contamination at the Gilmore site.  DTSC

**4**

estimates that the additional cleanup and oversigth costs for the Gilmore site will be between $432,500 and $632,000. *Id*. at 3.

**B.    The Proposed Consent Decree Between DTSC and Western**

After Chevron's settlement was revealed to the other Defendants, Western approached DTSC to open settlement negotiations. A Letter of Intent was signed in April 2004, whereby Western would investigate the Cady Property. Initially, Crompton and Dow objected to the terms on the basis that Western had misrepresented its involvement with SJDC in its discovery responses (unduly minimizing its potential liability). Western supplemented its discovery responses on May 7, 2004, prompting DTSC to withdraw from the April Letter of Intent. Further negotiations ensued and a new Letter of Intent was signed on June 3, 2004. The June Letter of Intent was substantively the same as the April Letter of Intent with an added requirement that Western make an additional payment of $200,000 to $300,000 depending upon the results of the investigative work at the Cady Property.

Under the terms of the settlement between DTSC and Western, Western will complete a set of tasks designed to investigate and characterize the contamination, if any, at the Cady Property. Doc. 161, Ex. 3, at 1. Western will undertake these tasks in Phases, as paraphrased below:

**Phase 1:** Western will collect and analyze soil samples from 40 locations distributed evenly in a grid pattern across the Cady Property. If any samples contain concentrations of hazardous chemicals exceeding specified limits, further investigation will ensue in Phase 2.

**Phase 2:** In Phase 2, Western will collect and analyze samples in the vicinity of any Phase 1 location where soil screening levels are exceeded. Samples will be taken from deeper depths than the Phase 1 samples to determine the vertical extent of

5

|   |   |   |
|---|---|---|
| 1 |  | contamination.  If the Phase 2 sampling shows that soil contamination appears to extend to groundwater, Phase 3 will be required. |
| 2 |  |  |
| 3 | **Phase 3:** | In Phase 3, Western will collect groundwater samples.  Western will also provide lithographic information for evaluation of potential contaminant migration.  If Phases 1, 2, or 3 of the investigation indicate that groundwater is contaminated by "constituents of concern" ("COCs") at concentrations above applicable regulatory levels, Phase 4 will be required. |
| 4 |  |  |
| 5 |  |  |
| 6 |  |  |
| 7 |  |  |
| 8 | **Phase 4:** | In Phase 4, Western will conduct additional groundwater monitoring to assist in determining the extent of contamination and groundwater flow direction.  Western will install and develop three shallow groundwater monitoring wells, and will sample water for all COCs for two calendar quarters. |

*Id.* at 1-5.  Western will also pay DTSC's oversight costs associated with the work set forth above.  Doc. 161 at 5.

In addition, Western agrees to make an additional payment toward DTSC's response costs.  The amount of the additional payment will be as follows:

**(1)** If the investigation of the Cady Property ends at Phase 1..., [Western] will pay $300,000 toward DTSC's Response Costs.

**(2)** If the investigation of the Cady Property ends at Phase 2..., [Western] will pay $250,000 toward DTSC's Response Costs.

**(3)** If the investigation of the Cady Property continues through Phase 3, [Western] will pay $200,000 toward DTSC's Response Costs.

**(4)** If the investigation of the Cady Property continues through Phase 4, [Western] will pay $200,000 toward DTSC's Response Costs.

*Id.* at 12-13.

Lastly, upon Court approval and entry of the Consent Decree, all claims against Western with regard to the San Joaquin Drum Company Properties will be dropped, and Western will be protected

6

against any claims for contribution to the extent permitted by law. *Id*. at 13-14.

Western estimates that the cost of each phase of the work it has agreed to perform would fall within the following ranges:

>   Pre-phase work: $28,992 - $80,782
>   Phase 1 work: $125,219 - $186,698
>   Phase 2 work: $116,749 - $415,958
>   Phase 3 work: $48,366 - $93,351
>   Phase 4 work: $85,080 - $153,015

*See* Doc. 168 at 3. Therefore, in a "best case" scenario, where western only had to complete Phase 1 of the work, Western would expend between $154,211 and $367,480 (the sum of the low and high ends of the ranges of costs for the Pre-phase work and the Phase 1 work) plus $300,000 toward DTSC's response costs, for a total cost figure of between $454,211 and $667,480. In a "worst case" scenario, Western would expend between $404,406 and $929,804 (the sum of the low and high ends of the costs for all phases of work) plus $200,000 toward DTSC's response costs, for total cost of between $604,406 and $1,129,804. Accordingly, the range of Western's potential exposure from this settlement is between $454,211 (the low end of the estimate if the investigation ends at Phase 1) and $1,129,804 (the high end of the estimate if the investigation ends at Phase 4).[3]

In addition to the costs Western has agreed to cover, DTSC

---

[3] These figures do not include the $25,000 to $50,000 estimated costs for DTSC's oversight of Western's activities. Doc. 169 at 3 n.2. This cost is factored into the analysis of substantive fairness below.

estimates that it may spend $200,000 to perform additional remedial work at the Cady site.[4]  Doc. 188 at 4.

DTSC formally moved for judicial approval of the Western Consent Decree on July 9, 2004.  Doc. 157.  The proposed order was erroneously signed on July 15, 2004, but rescinded on July 20, 2004 to allow for completion of preliminary investigatory work by Chevron at the Gilmore Property.  *See* Doc. 181.  On August 2, 2004, Crompton and Dow filed a joint opposition to DTSC's motion for approval of the Decree. Doc. 165.  DTSC filed a reply on August 9, 2004.  Doc. 168.  Western joined in DTSC's reply and filed a reply brief of its own on August 9, 2004.  Doc. 169.  Oral argument was heard on August 16, 2004.  On May 4, 2005, after Chevron's preliminary data from the Gilmore Property was evaluated, Crompton and Dow withdrew opposition.  Doc. 185. DTSC now submits an unopposed motion for approval of the Consent Decree between DTSC and Western.  Doc. 186, filed May 24, 2005.

### III.  JURISDICTION AND VENUE

This Court has subject matter jurisdiction over the proposed Consent Decree pursuant to 42 U.S.C. § 9622(d)(1)(A), which provides that whenever a settlement is entered into with a PRP with respect to remedial action under 42 U.S.C. § 9606, except as otherwise provided in 42 U.S.C. 9622(g)(concerning de minimus settlements), "the agreement shall be entered in the appropriate United States district court as a consent decree" for approval. Venue is appropriate in this district pursuant to 42 U.S.C. § 9613(b).

---

[4]  DTSC notes that there may be additional PRPs connected to the Cady site, apart from the parties to this case.  Doc. 188 at 4.

8

## IV. DISCUSSION

### A. Legal Standard

A consent decree is "essentially a settlement agreement subject to continued judicial policing." *See Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983). When reviewing a consent decree, a district court must independently scrutinize its terms and avoid "rubber stamp approval." *United States v. Montrose Chem. Corp. of Cal.*, 50 F.3d 741, 747 (9th Cir. 1995); *see also* 42 U.S.C. § 9622(d)(1)(A). Court approval of a consent decree is not a decision on the merits or a process designed to achieve the optimal outcome for all parties. *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir. 1990). Rather, it is "an amalgam of delicate balancing, gross approximations, and rough justice." *Id.* at 581. Nevertheless, a district court can abuse its discretion if it fails to consider certain types of indicators of fairness. *See Montrose Chem.*, 50 F.3d at 747 (holding that the district court abused its discretion in determining that a CERCLA consent decree was substantively fair, absent consideration of any estimate of projected total damages).

In evaluating a consent decree, a court should consider whether the consent decree is: (1) fair (both procedurally and substantively), (2) reasonable, and (3) consistent with the purposes of CERCLA and RCRA. *Montrose Chem.,* 50 F.3d at 747 (citing *United States v. Cannons Eng'g Corp.*, 899 F.2d 79, 84 (1st Cir. 1990)).

### B. Fairness

Fairness, in the context of CERCLA and RCRA, "has both procedural and substantive components." *Cannons*, 899 F.2d at 86.

9

### 1. Procedural Fairness

To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance. *Id.* After nearly six years of negotiations, site investigations, and litigation, Western and DTSC came to an agreement. Doc. 169 at 1. Western and DTSC negotiated and executed the agreement after considering the universe of evidence and the risks associated with litigation. Doc. 161 at 6; Doc. 169 at 1. Both Parties concluded that "the payment of response costs and performance of the work encompassed by the Consent Decree was fair, reasonable, and consistent with the goals of CERCLA." Doc. 169 at 1. The Consent Decree appears to have been negotiated in good faith and through a procedurally fair process.

### 2. Substantive Fairness

Substantive fairness flows from procedural fairness. "To the extent that the process was fair and full of adversarial vigor, the results come before the court with a much greater assurance of substantive fairness." *Cannons*, 899 F.2d at 87 n.4; *see also United States v. Akzo Coatings of Am., Inc.*, 949 F.2d 1409, 1433 (6th Cir. 1991). A consent decree that is substantively fair incorporates concepts of "corrective justice and accountability: a party should bear the cost of the harm for which it is legally responsible." *See Cannons*, 899 F.2d at 87. In conducting that evaluation, a court should determine the proportional relationship between the amount to be paid by the settling defendant and the government's estimate of the projected total cost of cleanup. *See Montrose Chem.,* 50 F.3d at 747. An

**10**

amount paid is fair if it roughly mirrors the settling defendant's proportional liability of the projected total costs. *Cannons,* 899 f.2d at 87. The measure of proportional liability calculated by the government "should be upheld unless it is arbitrary, capricious, and devoid of a rational basis." *Id*.

The parties estimate that Western's payment to DTSC will range from a minimum of $454,000, plus payment of DTSC's oversight costs, to a maximum of $1,129,804, plus payment of DTSC's oversight costs. Doc. 185 at 4. Western estimates these costs to be between $25,000 and $50,000. Doc. 169, at 3 n.2. DTSC has provided sufficient evidence to reasonably establish approximate proportional liability among Defendants without prompting judicial intervention. *See* Doc. 168 at 10-11.

According to the representations of the parties, the total estimated cost of the cleanup is estimated to be as follows:

|  | Low Estimate | High Estimate |
| --- | --- | --- |
| Range of Costs likely to be incurred by Chevron | $542,000 | $642,000 |
| Cost previously incurred by DTSC | $1,000,000 | $1,000,000 |
| Costs likely to be incurred by DTSC in the future at Gilmore site | $432,500 | $632,000 |
| Costs DTSC may incur at Cady Site. | $0 | $200,000 |
| Investigative costs likely to be incurred by Western at Cady site. | $154,211 | $929,804 |
| Oversight costs likely to be incurred by Western. | $25,000 | $50,000 |
| Total | $2,128,711 | $3,403,804 |

Assuming Western's best case scenario, it will expend $154,211 on work at the Cady site, contribute $300,000 to cover DTSC's previously incurred costs, and pay $25,000 in oversight, for a total expenditure of $454,211. Assuming all other costs run to the high end of their ranges, the total expenditures by all parties would reach $2,653,211.[5] Under this scenario (with Western expending at the low end of its range and all other parties expending at the high end of their ranges), Western will pay approximately 18 percent of the total estimated costs of cleanup. On the opposite end of the spectrum, if Western expends at the high end of its range, it will pay out $929,804 in investigatory work at the Cady site, $200,000 to cover DTSC's previously incurred costs, and $50,000 in oversight costs, for a total expenditure of $1,179,804. Assuming all other parties expend at the low end of their ranges, the total cost of cleanup will be $2,944,304.[6] Under this scenario (Western expending at the high end of its range and all other parties expending at the low end of their ranges), Western will pay approximately 40 percent of the total estimated cost of cleanup.

Whether a settlement that requires Western to pay between 18 and 40 percent of the total estimated cleanup costs is fair

---

[5] $642,000 (the high end of the costs likely to be incurred by Chevron) + $1,000,000 expended by DTSC to date + $200,000 DTSC may have to expend at Cady + $154,211 (the low end of the investigatory costs Western may incur) + $25,000 (the low end of the oversight costs Western may incur).

[6] $542,000 (the low end of the costs likely to be incurred by Chevron), +$1,000,000 expended by DTSC to date + $0 (assuming DTSC expends no additional funds at Cady) + $929,804 (the high end of the investigatory costs Western may incur at Cady) + $50,000 (the high end of the oversight costs Western may incur).

depends on Western's comparative contribution to the environmental problem. DTSC maintains that

> In light of the existing evidence against each defendant, it is not unreasonable that Crompton and Dow together be held to answer for more work and more response costs than Western Farm Services, and for response costs that might be related in some respect to pesticide contamination. First, Crompton by all accounts was the biggest customer of SJDC as far as number of drums reconditioned. While DTSC does not have precise numbers, because SJDC kept no records, by all accounts Golden Bear Refinery (the company on which Crompton's liability is based) was a large, if not the largest customer of SJDC, using the company on a regular basis. Discovery against a former Dow employee also establishes that it was a customer, though likely a much smaller one in number of drums serviced as compared to Crompton.
>
> Second, while Crompton has taken the position that its predecessor, Golden Bear Refinery, sent only petroleum drums to the site, petroleum contamination is in fact part of what makes the pesticide contamination more of a problem. As DTSC has noted, the presence of other chemicals and substances, including petroleum products and solvents, can make pesticides more mobile in soil and cause them to enter groundwater.
>
> Finally, Crompton ignores that Golden Bear Refinery may in fact have been responsible directly for pesticide contamination at SJDC. Jude Hupp, a former employee of Golden Bear Refinery, testified that the drums Golden Bear Refinery sent to SJDC were not limited to drums that had contained its own product. According to Mr. Hupp, the refinery would take back Golden Bear product drums for credit, but it would also accept non-Golden Bear drums as a courtesy to the customer, "drums that [the customer] had no other way of getting rid of legally, lawfully. Golden Bear Refinery's customers included a wide range of businesses, including agricultural enterprises; it is therefore reasonable to assume that the drums that SJDC picked up from Golden Bear Refinery likely included used pesticide drums.

Under the terms of the previously approved Chevron-DTSC settlement, Chevron agreed to pay anywhere between 16 and 28 percent of the total cost of cleanup.[7] If the Western-DTSC

---

[7] If Chevron pays at the low end of its range ($542,000) while all other parties pay at the high end of their ranges

settlement is approved, Western will pay anywhere between 17 and 39 percent of the total estimated cost of cleanup. Accordingly, together, Chevron and Western will roughly cover between 34 (16 from Chevron + 18 from Western) and 68 (28 from Chevron + 40 from Western) percent of the total estimated cost of cleanup. This would leave as much as 65 or as little as 32 percent of the cleanup to be shared by Dow and Crompton together. Given DTSC's assessment of the comparative fault of Dow and Crompton, and its rough estimate that "it is not unreasonable that Crompton and Dow together be held to answer for more work and more response costs that Western Farm Services," the allocation of costs under the Western Consent Decree is substantively fair.

### C. Reasonableness

Evaluation of a consent decree's reasonableness is a multifaceted exercise. A court should take into consideration (1) "any reasonable discounts for litigation risks, time savings, and the like that may be justified." *Montrose Chem.*, 50 F.3d at 747. It is also appropriate to consider (2) whether the decree is technically adequate to accomplish the goal of cleaning the environment, and (3) whether it will sufficiently compensate the public for the costs of remedial measures. *See Cannons*, 899 F.2d at 89-90.

---

($542,000 + $1,000,000 + $632,000 + $200,000 + $929,804 + 50,000 = $3,353,804), Chevron will pay 16 percent of the total cost of cleanup. If Chevron pays at the high end of its range ($642,000) while all other parties pay at the low end of their ranges ($642,000 + $1,000,000 + $432,000 + $0 + $154,211 + $25,000 = $2,258,211), Chevron will pay approximately 28 percent of the total cost of cleanup.

**14**

### iii. Reasonable Discounts

If DTSC is forced to continue litigation against Western, it will incur additional costs.  Doc. 168 at 11.  In addition, potential litigation risks associated with trying this case against Western are also substantial, given that there are only two witnesses linking Western to SJDC--one is dead, and the other is out of state and has been uncooperative.  *Id.* at 11.  Finally, DTSC also points out that "there is always a risk that Western [] could extract itself from this case completely."  *Id.* at 11.  Approval of the Decree will allow the cleanup process to move forward without inherent delays from a trial on the merits.  The Consent Decree reflects reasonable discounts for the strength of the government's case against Western, litigation risks, and time savings.

### i.    Technical Adequacy

The settlement calls for the hazardous waste investigation to be conducted under the direction and supervision of either a licensed professional engineer or registered geologist.  The agreement also calls for the implementation of potentially four Phases of investigation, depending on the level of contamination found.  Each Phase subsequent to the first Phase is contingent on the results of the Phase preceding it--i.e., if the results of the first Phase show contamination, the second Phase will be instituted.  Doc. 161 at 8.  DTSC approval is required for Western's "Workplan," which will set forth in detail all technical and operational plans for implementing the

investigation.  *Id*.  The Consent Decree is technically adequate to accomplish the goal of cleaning the environment.

### ii. Compensation of the Public for Costs of Remedial Measures

Western will complete a set of tasks designed to investigate and characterize the contamination, if any, at the Cady Property. *Id.* at Ex. 3, 1.  Additionally, Western will make an additional payment of $200,000 to $300,000 depending upon the results of the investigative work.  Id. at 12.  In sum, Western has agreed to cover between 18 and 40 percent of the total costs of cleanup. Alongside the Chevron settlement, even if DTSC recovers no additional funds from any other PRP, at least 34 percent and as much as 68 percent of the total estimated cost of cleanup will have been covered by two parties that are not solely responsible for site contamination.

### D. Consistency With Purposes of CERCLA and RCRA

The first inquiry is whether the consent decree is consistent with the public purposes of CERCLA and RCRA.  *See Akzo Coatings,* 949 F.2d at 1435.

CERCLA's primary purpose is "to facilitate government cleanup of hazardous waste discharges and prevent[] future releases."  *Exxon v. Hunt Corp.*, 475 U.S. 355, 359-60 (1986). CERCLA also has a strong policy of encouraging early settlements. *See* 42 U.S.C. § 9613(f)(2)(immunizing settling PRPs from liability in claims for contribution); *see also Montrose* Chem., 50 F.3d at 746.

"RCRA's primary purpose is to reduce the generation of hazardous waste and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to

16

minimize the present and future threat to human health and the environment.'" *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 483 (1996)(citing 42 U.S.C. § 6902(b)).

Here, the Consent Decree between Western and DTSC facilitates the progress of cleanup at the Cady site by ensuring prompt assessment of the environmental damage and cleanup needs. Western guarantees that the assessment process will be completed promptly if the Decree is approved. Doc. 168 at 12. The cash payment Western has also agreed to make will reimburse DTSC for a portion of the work previously performed at the Gilmore property. *Id.* The Consent Decree furthers the public interests CERCLA and RCRA are intended to serve.

In sum, the Consent Degree is consistent with the policies underlying CERCLA and RCRA, is both procedurally and substantively fair, and is reasonable.

## VI.   CONCLUSION

Accordingly, for the reasons set forth above, the Consent Decree between Western and DTSC is **APPROVED** and **ENTERED**.

**SO ORDERED.**

**Dated: August 30, 2005**                    **/s/ OLIVER W. WANGER**

　　　　　　　　　　　　　　　　　　　　　_____
　　　　　　　　　　　　　　　　　　　　　　　**Oliver W. Wanger**
　　　　　　　　　　　　　　　　　　　　**UNITED STATES DISTRICT JUDGE**